**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| DONALD NASH ) | |
| ) | |
|    -and- ) | |
| ) | |
| THERESA NASH, ) | |
| ) | |
|       Plaintiffs, ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| HENRY JAMES FOLSOM, ) | JURY TRIAL DEMANDED |
| Serve at:   1000 Cobblestone Ct. ) | |
|         Lebanon, MO  65536-7500 ) | |
| ) | |
| SCOTT MERTENS, ) | |
| Serve at:   Missouri State Highway Patrol ) | |
|         1301 Nagogami Rd. ) | |
|         Rolla, MO  65402 ) | |
| ) | |
| RUTH MONTGOMERY, ) | |
| Serve at:   Missouri Hwy. Patrol Crime Lab ) | |
|         1510 East Elm St. ) | |
|         Jefferson City, MO  65102 ) | |
| ) | |
|    -and- ) | |
| ) | |
| DOROTHY TAYLOR, ) | |
| Serve at:   Alcohol and Tobacco Control ) | |
|         1738 E. Elm, Lower Level ) | |
|         Jefferson City, MO  65102-0837 ) | |
| ) | |
|       Defendants. ) | |

## COMPLAINT

Plaintiffs Donald Nash and Theresa Nash bring the following Complaint against

Defendants Henry James Folsom, Scott Mertens, Ruth Montgomery, and Dorothy Taylor

("Defendants") arising out of Nash's wrongful arrest, detention, prosecution, and conviction for capital murder.

## Introduction

1.     Plaintiff Donald Nash was wrongfully arrested, detained, prosecuted, and convicted of capital murder.  In 2008, twenty-six years after the murder of Judy Spencer, Nash was wrongfully arrested and detained due to the illegal actions of Defendants, who were employees of the Missouri Highway Patrol, and then wrongfully prosecuted and convicted of capital murder, R.S. Mo. § 565.001 (1978), in October 2009 due to these illegal actions and the false testimony of Defendant Ruth Montgomery, who was another employee of the Missouri Highway Patrol.  Thus, beginning with his wrongful arrest in 2008, Nash spent twelve consecutive years in jail or prison for a murder he did not commit. In 2020, the Supreme Court of Missouri exonerated Nash and set aside his conviction, after which the prosecution dismissed the charges against Nash.

2.     Nash is innocent.  Nash had nothing to do with Spencer's murder and has always maintained his innocence.

3.     All investigators who testified in Nash's habeas corpus proceedings, including two Defendants, conceded they did not have probable cause to arrest Nash for the twenty-six years after Spencer's 1982 murder.  Then, in 2008, a trace amount of DNA was found under Spencer's fingernails (which another Highway Patrol officer had clipped at the time of her autopsy).

4.      In 2020, the State conceded that it could not present an expert to testify reliably in Court that this miniscule DNA sample even belonged to Nash.   In 2008, however, Defendants concluded that the miniscule amount of DNA belonged to Nash. Even so, the presence of Nash's DNA would be totally unremarkable because Spencer and Nash lived together in a romantic relationship.   As a result, Defendants wrongfully collaborated on, prepared, and promoted a false probable cause statement to implicate Nash in the murder by fabricating a false "scientific" theory that Spencer's act of washing her hair on the evening before her murder would have eliminated Nash's preexisting DNA.   In their desire to implicate Nash through false evidence, Defendants recklessly failed to investigate other suspects, suppressed evidence of other suspects, and even sought to obstruct another law enforcement officer as he gathered evidence to charge another suspect with Spencer's murder.

5.      Defendants maliciously and recklessly prepared a false probable cause statement to implicate Nash in Spencer's murder. That false probable cause statement started the process that resulted in Nash's unlawful arrest, prosecution, conviction, and detention for the next twelve years until his exoneration by the Supreme Court of Missouri. Nash and his wife lost twelve years of their lives together as part of Defendants' reckless and malicious quest to solve a cold case at any cost by ensuring that Nash would be arrested for, and convicted of, capital murder.

## Parties and Jurisdiction

6.      Plaintiffs Donald and Terri Nash are married and currently reside within the borders of the Eastern District of Missouri, Eastern Division.   Nash was wrongfully

arrested, detained, prosecuted, and convicted within the borders of the Eastern District of Missouri, Eastern Division.  Throughout those twelve years, Terri Nash suffered injury as she continued to reside at their home in Beaufort, Missouri, which is within the Eastern District of Missouri, Eastern Division.  Plaintiffs' claims for relief arose in the Eastern District of Missouri, Eastern Division.

7.     Defendant James Folsom ("Folsom") is a former employee of the Missouri State Highway Patrol and was one of the moving forces behind Nash's wrongful arrest, detention, prosecution, conviction, and incarceration.  Folsom recklessly failed to investigate other suspects, impeded another law enforcement agent investigating other suspects, and drafted and signed the false probable cause statement used to arrest Nash.

8.     Defendant Scott Mertens ("Mertens") is a former employee of the Missouri State Highway Patrol and was one of the moving forces behind Nash's wrongful arrest, detention, prosecution, conviction, and incarceration.  Mertens recklessly failed to investigate other suspects, withheld evidence implicating another suspect, and collaborated with Folsom and Taylor in developing the false probable cause statement used to arrest Nash.

9.     Defendant Dorothy Taylor ("Taylor") is a former employee of the Missouri State Highway Patrol and one of the moving forces behind Nash's wrongful arrest, detention, prosecution, conviction, and incarceration.  Taylor, who is not a scientist, concocted the false scientific opinion that led to Nash's wrongful arrest and incarceration. Taylor recklessly failed to investigate other suspects, provided the false information used

4

to arrest Nash, and collaborated with Folsom and Mertens on the false probable cause statement.

10.     Defendant Ruth Montgomery ("Montgomery") is an employee of the Missouri State Highway Patrol Crime Lab and one of the moving forces behind Nash's wrongful arrest, detention, conviction, and incarceration.  Montgomery met with Folsom shortly before he executed the false probable cause statement.  Montgomery's subsequent false testimony was instrumental in the Nash's wrongful conviction of Nash. Montgomery's false testimony has been officially "discredited" by the Supreme Court of Missouri.

11.     Most of the key events in this Complaint, including Nash's arrest without probable cause, prosecution, conviction, and 12-year detention, occurred within the borders of the Eastern District of Missouri, Eastern Division, including his false arrest, his denial of bond, his pre-trial detention, his trial, and his incarceration.

12.     Jurisdiction exists under 28 U.S.C. § 1343, which provides for original jurisdiction of this Court in suits authorized under 42 U.S.C. § 1983 to redress the deprivation under color of state law, statute, ordinance, regulation, custom, or usage of any right, privilege, or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of citizens or other persons within the jurisdiction of the United States.

13.     Supplemental jurisdiction over Plaintiffs' State common law claims exists under 28 U.S.C. § 1367.

14.     Venue is proper in this District and Division because Plaintiffs reside in this District and Division, Plaintiffs' claims for relief arose in this District and Division, and, on information and belief, at least one of the four Defendants resides in this District and Division.

## **Summary of the Crime**

15.     In March 1982, Nash's girlfriend, Judy Spencer, was murdered outside Salem, Missouri.  On the evening before the murder, Nash and Spencer had a brief, non-violent argument about Spencer's drinking and driving outside a friend's apartment.  After the argument, Nash returned to the home he shared with Spencer.  Spencer kept drinking, returned home to Nash to change clothes (with no violent altercation), and then drove back to her friend's apartment to continue drinking.  After Spencer left, Nash telephoned the friend to tell her he was worried that Spencer would get into a car accident or be arrested for drinking and driving.

16.     There are no eyewitnesses who have ever come forward and placed Nash and Spencer together at any point after Spencer left their home that night.

17.     Spencer arrived to her friend's apartment safely.  After Spencer continued drinking for a while, Spencer left the friend's apartment alone.  As Spencer departed, she said she planned to drive to bars in Houston, Missouri, a nearby town.  She took a Busch beer bottle with her in the car.  The last known eyewitnesses who saw Spencer alive was another resident of the apartment complex, who watched as Spencer pealed out of the parking lot.

18.     Around that time Nash called Spencer's friend again and reiterated that he was concerned about Spencer's drinking and driving.  Nash asked the friend to call him early the next morning if Spencer did not return that night.  Both Nash and Spencer's friend separately went looking for Spencer in Salem, but neither found her.  Spencer did not come home that evening.

19.     Two farmers found Spencer's body the following day outside Salem at an abandoned one-room schoolhouse in the foundation of an old outhouse.  Spencer was naked from the waist down, and her breasts were exposed, indicating the murder was sexually motivated.  She had a blood alcohol content of 0.18 at the time of her death.

20.     Spencer had been strangled to death with a shoelace taken from her left shoe, and then shot with a shotgun in the neck.  Nash did not own or have access to a shotgun. Defendants do not know the make or model of the shotgun used to shoot Spencer. Defendants located no evidence identifying a shotgun Nash could have supposedly used in the murder before they arrested him.

21.     Years later, DNA testing of Spencer's left shoelace and shoe was performed. Both items contained unidentified male DNA.  The DNA did not belong to Nash.  Nash's DNA was not found on Spencer's left shoelace or Spencer's left shoe.

22.     Investigators also identified fresh tire tracks at the schoolhouse.   The measured width of the tire tracks was 7 1/2 inches wide and 70 inches from inside to inside or 77 inches between midpoints.  At the time of the murder, Nash owned a 1979 K-10 pickup, and Spencer owned a 1976 Oldsmobile sedan.  The tire track width of the distance between the midpoints of the front tires of a 1979 K-10 pickup is 65.8 inches for the front

tires and 62.7 inches for the rear tires.  The tire track width of the distance between the midpoints of the front tires of a 1976 Oldsmobile sedan is 63.7 to 64 inches.  In short, the fresh tire tracks did not belong to either Nash's truck or Spencer's car.  This information was readily available since the time of the murder.  The vehicle that left those tire tracks remains unidentified.

23.     Spencer's car was located in a ditch, many miles away from the schoolhouse, and in the opposite direction from Salem.  The car doors were unlocked, and Spencer's keys and windbreaker were inside the car.  The car's dome light was still on.  A Busch beer bottle was on the passenger's floor, but in addition, a Busch beer can was on the driver's floorboard.  Five more Busch beer cans were found at the schoolhouse, which, together with the can found in the car, would make a six-pack.  There is no record that the Busch beer can inside Spencer's car was ever tested for fingerprints or preserved as evidence.  Further, none of the five other beer cans was tested for fingerprints either, and they were not preserved as evidence.  On information and belief, the evidence inside the vehicle was processed by Sgt. P.J. Mertens, the father of Defendant Mertens.

24.     Investigators located two sets of fingerprints on the front-side windows of Spencer's abandoned car.  Nash's fingerprints were not found on the car.  One set of fingerprints belonged to a violent sex offender, Lambert Anthony Feldman III.  The second set of fingerprints belonged to Alfred John Heyer III, who lived next to the ditch.  Police had spied Heyer standing in the distance as they searched Spencer's car.  Heyer denied ever touching Spencer's car, which was a lie.  Heyer also claimed that he had not seen the car outside his home that morning when he left for work.  This was also a lie.  Two weeks

after Spencer's murder, without notice to his wife and young child, Heyer quit his job and moved out of state.

25.     No witnesses ever placed Nash at the abandoned schoolhouse or the ditch where Spencer's car was found.  No physical evidence ever placed Nash at the abandoned schoolhouse or the ditch where Spencer's car was found.

26.     Nash, who was innocent, had no idea Spencer had been murdered and had worried about her safety since the prior evening.  When Spencer did not return home, Nash took the day off work.  He and Spencer's friend drove to Houston to search for Spencer. They did not find Spencer or her car.   During the trip, Nash continued to express concern for Spencer's safety.

27.     Shortly afterward, Nash and the friend were directed to go to the hospital, where investigators informed them of Spencer's death.  Nash broke down crying.  The investigators then administered a gunshot residue test on Nash to see whether Nash had recently handled a shotgun.  The gunshot residue test was negative.  The investigators who viewed Nash during the GSR testing did not observe any evidence that Nash had been involved in a struggle.

28.     When Spencer's friend next saw Nash, he was, in her words, "broken-hearted."  The friend provided investigators with a list of people "who might be mad at" Spencer, and she did not include Nash on that list.  Nash was not charged with the murder between 1982 and 2008.  Mertens and Taylor testified before Judge Rick Zerr, the Special Master appointed by the Supreme Court of Missouri in Nash's habeas corpus case, and

conceded that they did not have probable cause to file charges against Nash during that period.  He was not even the primary suspect.

## **False Arrest**

29.     Defendants developed their false and malicious case against Nash based on a trace amount of DNA discovered underneath Spencer's fingernails in 2008.  In 2020, following Nash's exoneration by the Supreme Court of Missouri, the State admitted to Nash that the trace DNA sample is not robust enough to identify the DNA as even belonging to Nash.

30.     Even if the DNA did belong to Nash, however, it is meaningless.  Nash's arrest, detention, prosecution, and conviction rested on baseless and false junk science that was specifically invented to mislead the courts and jurors that Nash deposited his DNA during a struggle with Spencer.

31.     In March 2008, at the request of Spencer's sister, the Missouri State Highway Patrol's crime laboratory tested Spencer's fingernails (which had been clipped during her autopsy in March 1982) for DNA. The laboratory located a trace mixture of Spencer's and (allegedly) Nash's DNA underneath the fingernail clippings from Spencer's left hand. The total amount of the mixture was 5 billionths of a gram.  Within eight days, Nash was charged Nash with Spencer's murder.

32.     A small group of Missouri Highway Patrol officers in its Rolla office, consisting of Folsom, Mertens, and Taylor, decided to charge and arrest Nash for the murder of Spencer without conducting the required due diligence and investigation.  They

arrested Nash despite the absence of probable cause that Nash had committed the murder, including that:

(a) No eyewitnesses purported to connect Nash to the crime;

(b) No physical evidence purported to connect Nash to the crime;

(c) There was no murder weapon recovered, and Nash had no access to a shotgun;

(d) Nash's gunshot residue test had been negative;

(e) Nash had no scratches on his arms or hands to indicate he had been involved in a struggle;

(f) Nash steadfastly maintained his innocence;

(g) The fresh tire tracks at the schoolhouse belonged to an unidentified vehicle and did not match either Nash's vehicle or Spencer's vehicle; and

(h) There were two more viable suspects who had left fingerprints on Spencer's car, among other evidence against those suspects.

33.     Furthermore, Folsom, Mertens, and Taylor understood that people who live together, including in a romantic relationship, commonly have one another's DNA under their fingernails.  As a result, they concocted a baseless and false junk science theory asserting that because Spencer washed her hair on the evening of her murder, any of Nash's DNA present before Spencer washed her hair would have been washed away

34.     Taylor testified in Nash's habeas corpus case "obviously, we kn[e]w that" they were going to have a problem proving Nash's guilt because people who live together have one another's DNA under their fingernails.  She conceded in her deposition that

11

before the DNA was found and she learned about the hair washing, there was insufficient evidence to charge Nash with the crime.  The problem, of course, is that the hair washing theory was fabricated.

35.     When asked about the "significance" of the hair washing, Taylor responded:

Because I'm not an expert on DNA, we had discussions and – about that specifically. And that it was – in my mind, not being an expert in DNA, that if she had washed her hair, that likely would have removed that foreign DNA.  And doing the timeline and by Nash's own admission[1] that he had not – there had not been any contact with her after the – with him and her after the fact that she washed her hair.

36.     Defendants Folsom, Mertens and Taylor, none of whom are experts on the issue, thus advanced this baseless and false theory that none of Nash's DNA would have remained after the hair washing in order to charge Nash with Spencer's murder.

37.     Folsom then prepared and filed a probable cause statement against Nash, which stated:

It was further determined that a mixture of Judy Spencer's DNA and Doc Nash's DNA was found under the left hand fingernails of Judy Spencer and **this DNA could have not have remained present during hair washing** nor was it reportedly transferred during casual contact with Doc Nash. This mixture of DNA is often normally the result of a physical struggle.

This probable cause statement was reviewed by Mertens and Taylor before Folsom signed under oath and submitted it to the Dent County Prosecutor.  This probable cause statement was false.  Folsom, Mertens, and Taylor had no scientific, reliable or other proper basis for

---

[1]     This testimony is inaccurate.  Although additional contact between Nash and Spencer is not necessary in light of the fact that Nash's DNA could have remained after the hair washing, Taylor inaccurately states that after Spencer left Jones' apartment the first time, Nash and Spencer did not have contact.  The police reports clearly disclose that Spencer and Nash were together at their house where she went there to change clothes.

asserting that Nash's DNA would have been washed away and that the presence of the DNA normally results in a physical struggle.  There was no evidence of a physical struggle between Spencer and Nash.

38.     Defendants Folsom, Mertens and Taylor knew this theory was baseless and not true or were extremely reckless in devising, promoting it, and using it to arrest, charge, and detain Nash.  They did no due diligence in determining whether it was true.

39.     As Judge Zerr observed in recommending Nash's exoneration:

> The State's case exemplifies a case of tunnel vision.  After the State obtained the fingernail DNA sample, the State began to retrofit information to justify its case. From the beginning, in the absence of eyewitness or meaningful physical evidence, the State's case has demanded that jurors engage in countless strained inferences. Namely, the State asks jurors to infer that because 2.5 nanograms of Nash's DNA remained underneath Spencer's fingernails after Spencer washed her hair, "therefore" Nash somehow found a shotgun and used his pickup to drive Spencer's car off the road to abduct her and take her to the abandoned schoolhouse where he brutally murdered her.  *Inferences like this stretch any notion of credulity and are simply unsupported by any particular piece of evidence.*

40.     Furthermore, in order to attempt to bolster the lack of incriminating evidence against Nash, Folsom recklessly and/or maliciously manufactured additional "evidence" he contended indicated Nash's guilt.  He prepared a report stating that although Nash willingly provided his DNA sample to Folsom, Nash "appeared very nervous, and asked Folsom to let him know if he was eliminated."  Folsom further wrote in the report that, when he told Nash that male DNA had been found, Nash "paused and took a step back and just kind of stared at [Folsom] for a few seconds."

41.     Folsom prepared a second report about 10 days later purportedly describing the occasion when he revisited Nash to tell him his DNA was found on the victim and at

the crime scene.  He wrote and later testified that Nash said that was "not possible" and was shaking.  Folsom's statement was false; Nash's DNA was not found on the victim *and* at the crime scene.  Folsom testified at Nash's trial about Nash's purported nervousness and "shaking" in order to imply to the jury that these actions indicated Nash was guilty of Spencer's murder.

42.     Folsom's conduct in preparing and submitting a false probable cause statement, in ignoring the compelling exculpatory evidence, manufacturing "evidence," testifying about Nash's purported staring and nervousness, and failing to do a proper investigation of Spencer's murder was deliberate and intentional to harm Nash, was done with extreme recklessness, and with malice toward Nash.

43.     Folsom continued his animus toward Nash throughout Nash's efforts to have his wrongful conviction vacated.  Nash's counsel sought to take Folsom's deposition in 2020 in Nash's habeas proceeding, but Folsom failed to answer messages from Nash's counsel and evaded service of process to subpoena him for his deposition, sending a message through his wife to the process server that he would not appear to testify, even if he were served with a subpoena.

44.     Defendants Folsom, Mertens, and Taylor assisted one another in the investigation, shared information and individually and collectively participated in the misconduct alleged in this Complaint, and also facilitated, condoned, approved and turned a blind eye to each other's misconduct.

**Failure to Investigate and Withholding Exculpatory Evidence**

45.     As stated above, the fingerprints from the driver's side window of Spencer's abandoned car belonged to Lambert Anthony Feldman III ("Feldman") and Alfred John Heyer III ("Heyer"). Former Dent County Sheriff Deputies Tim Bell ("Bell") and Steven Lawhead ("Lawhead"), who investigated the case in the 1990s and 2000s, respectively, testified in Nash's habeas proceedings that the State did not have probable cause to arrest Nash.  Their investigations focused more on Feldman and Heyer, respectively.

46.     At the time of Spencer's murder in 1982, Feldman was living in Rolla, Missouri, about 30 minutes from Salem. Feldman told the Missouri State Highway Patrol that he did not know Spencer and had never been to Salem, but witnesses stated they saw someone they identified by photograph as Feldman talking to Spencer at the Tower Inn in Salem a few days before Spencer's murder.

47.     Feldman had a history of sex-related offenses.  He admitted to investigators that he was responsible for a small hole drilled into the ladies' restroom at the gas station in Rolla where he had worked in 1982.

48.     In 1988, Feldman attacked a college student on a campus in Iowa, and was convicted of assault with intent to commit sexual abuse.  After Feldman's conviction for assault with intent to commit sexual abuse, Feldman was sentenced to one year in jail but was placed on probation.  Feldman's probation was revoked in 1991 when he was convicted of possessing open liquor in public and child endangerment.

49.     Feldman's arrest record also included:

(a) Driving with suspended license and possession of marijuana in April 1982;

15

(b) Displaying a deadly weapon and attempted first-degree assault (by striking a man in the head with a pistol) in December 1982;

(c) "Prowling" (peeping into a window of a home), trespassing, and opposing an officer in March 1983;

(d) Lewdly exposing himself;

(e) Driving while intoxicated in February 1984;

(f) Disorderly conduct in August 1984;

(g) Unlawful use of a weapon in May 1988;

(h) Robbery in the second degree in June 1988;

(i) Endangering the welfare of a child in December 1990; and

(j) Criminal misdemeanor of domestic battery/bodily injury for beating his wife in July 2005.

50.     In October 2008, after Nash's arrest, Feldman was found dead in Quincy, Illinois, after he committed suicide with a shotgun.

51.     Bell personally interviewed Feldman's ex-wife, ex-girlfriend, sister-in-law, and a female probation officer.  During Bell's interviews, all of the women stated that they were afraid of Feldman. Feldman's female probation officer was, in fact, replaced by a male officer because she was afraid of Feldman. The last time Bell interviewed Feldman's ex-wife, she would not even talk to Bell until he showed her a death certificate proving that Feldman was dead.

52.     Feldman's sister-in-law told Bell that Feldman carried a shotgun in the trunk of his car around the time of Spencer's murder.

16

53.     Heyer, on the other hand, lived in the house next to where Spencer's abandoned car was found.  Although Heyer told investigators he had not touched Spencer's vehicle, his fingerprints established that he was lying.  Shortly after Spencer's car was found, Heyer began to monitor a police scanner for two weeks.  Then he abruptly left town, abandoning his wife and children and quitting his job without notice.  His wife filed a missing person report.  Heyer had, however, moved to the Chicago area.

54.     Heyer's neighbors were suspicious of him based on his history of violence, telling investigators he once shot a neighbor's dog.  When Dent County Sheriff's deputies sought to question Heyer in 2008 and asked him for a DNA sample to eliminate him as a suspect, he told them they could send a hit-man up to have him killed—that would be how he would be eliminated.

55.     In January 1996, the Missouri State Highway Patrol's Violent Crime Support Unit performed an Unsolved Case Review with respect to Spencer's murder. The panelists who performed the Unsolved Case Review were Sergeant Mike Martin of the Columbia Police Department, Chief Deputy Steve Myers of the Montgomery County Sheriff Department, Corporal John Waugh of the Springfield Police Department, and Corporal Don Windham of the Missouri State Highway Patrol. The panel concluded that Nash was not as strong of a suspect as Feldman or Heyer.

56.     None of Folsom, Mertens, or Taylor investigated Feldman or Heyer as a suspect in Spencer's murder.  None of them took into consideration the compelling exculpatory evidence that Nash did not murder Spencer.  None of them coordinated their investigations of Spencer's murder with the Dent County Sheriff's Office.

17

57.     At about the same time, Folsom, Mertens, and Taylor were racing to arrest Nash for the murder of Spencer while Lawhead preparing a probable cause statement to arrest *Heyer* for Spencer's murder.

58.     In fact, Folsom intentionally avoided working with Lawhead; and he deceived Lawhead to interfere with that office's investigation.   Sergeant Folsom had contacted Lawhead because he wanted to go to the evidence repository and retrieve evidence.  Lawhead agreed to allow Folsom to go with him because Lawhead wanted to see where the evidence was kept.  They made plans to go together on a Monday, but when Folsom never called, Lawhead learned that Sergeant Folsom had surreptitiously gone the previous Thursday without notifying Lawhead.

59.     Folsom, Mertens, and Taylor beat Lawhead to the local prosecutor. Folsom's probable cause statement was delivered to the local prosecutor, and Lawhead was instructed to discontinue his preparation of a probable cause statement against Heyer.

60.     Even worse, in a police report written by Mertens in 2009 that was not disclosed to Nash until 2020, Spencer's sister and sister-in-law approached Heyer about the murder after Nash's arrest, but before Nash's trial.  Heyer specifically told them that he was concerned that his DNA would be found on a beer bottle or beer can inside Spencer's car.  On information and belief, the evidence in this car was destroyed by, or at the instruction of, Mertens' father.  Mertens prepared a report with this information on September 11, 2009, over a month before Nash's conviction.  The report, which would have placed Heyer inside Spencer's vehicle and potentially drinking with the victim, was never shared with the defense before Nash's trial.

61.     Nash's counsel first learned of this statement by Heyer during Mertens' deposition in Nash's habeas corpus case, which was taken on January 30, 2020.   In Mertens' police report, he wrote that Heyer told Spencer's sister and sister-in-law that:

> Heyer even admitted that he had possibly thrown trash into Judy Spencer's vehicle when it was abandoned near his residence.  Paris stated that it was at this time that Heyer expressed his concerns that his DNA could have been found on a beer can or bottle found in the trash he threw in Judy Spencer's vehicle.

62.     Mertens' wrongfully withheld this material exculpatory evidence from the defense.  As Judge Zerr in his Amended Report observed:

> Heyer's statements cast further suspicion on him as a suspect.  Heyer denied ever seeing the car on the night.  This was later proved to be a lie based on his fingerprint on the car window.  This additional statement, if true, places Heyer not only outside the vehicle, but inside the vehicle.  It is strange behavior, to say the least, to see a wrecked vehicle outside one's own home and immediately throw trash in it, which is what Heyer appears to claim that he did.  From the police report, there was not recorded "trash" in the vehicle, but rather only a beer bottle on the passenger's floor and a beer can on the other side.

63.     Folsom's, Mertens', and Taylor's conduct in failing to investigate Feldman and Heyer and in arresting and detaining Nash, was reckless and/or intentional indifference and was contrary to proper investigation procedures.

64.     As a result of the intentional and wrongful conduct of Taylor, Mertens and Folsom described above, Nash was wrongfully arrested, detained, charged, and prosecuted for Spencer's murder.  Although Nash's neighbors and friends posted their farms and other real property to secure Nash's release on bail, the judge declined to accept the pledged property and insisted on a cash bond of $1 million.  Nash did not have that amount of cash,

and consequently was incarcerated continuously after his false arrest in March 2008 until his exoneration.

65.     The Nashes have been married for the entirety of this ordeal, from March 2008, through the present, and Terri Nash has faithfully remained by Nash's side after Defendants upended their lives.

**<u>False Evidence at Trial</u>**

66.     Realizing that neither Folsom, Mertens, nor Taylor could even pretend to have expertise to support the junk science basis for Nash's false arrest, the prosecution enlisted Defendant Montgomery, a criminalist, to provide the supposed "expertise" and "scientific" basis for the junk science used to arrest Nash.  Montgomery obliged by recklessly and intentionally providing a false opinion and creating the false impression that her testimony was grounded in actual science, even though she was fully aware of the lack of scientific support for the charges against Nash.

67.     Montgomery erroneously and falsely sought to portray herself as an expert on the effect of washing one's hair on the removal of DNA from one's fingernails, when, in fact, she was completely unqualified by knowledge or experience to testify as an expert on such an issue.  She had never done any testing or other work to determine the effect of hair washing on DNA removal.  She knew of no scientific studies regarding hair washing and certainly had not read any.  She had no scientific basis whatsoever for providing an opinion on the effect of hair washing on DNA removal; she just made it up.

68.     Not only was Montgomery's hair-washing theory unsupported by any scientific evidence, it was contradicted by what scientific evidence was available.

Montgomery knew of such evidence but dismissed it as anecdotal or correlational even though it was the only scientific evidence relevant to the issue.

69.     At trial, Montgomery pretended to be an expert on this issue and falsely told the jury that Spencer's hair washing would have had a "great effect" in removing any of Nash's pre-existing DNA under Spencer's fingernails.  This was not true.  There is no scientific support for this opinion.  It was a fabrication.  In fact, the available scientific evidence was to the contrary.

70.     Subsequent to Nash's conviction, Montgomery retracted her testimony, which was a distortion of the facts and any notion of science.  The testimony was recklessly and/or intentionally false and misleading and resulted in Nash's wrongful conviction for capital murder.  The Supreme Court of Missouri has ruled that Montgomery's trial testimony is officially "discredited."

71.     Indeed, no other criminal case in the United States has involved an expert testifying about the effect of hair washing on eliminating preexisting DNA from underneath fingernails.

72.     Montgomery now admits Nash's (alleged) DNA could well be the result of Nash and Spencer living together, and she knows of no evidence that it resulted from a struggle or physical altercation.  She further now admits, that there could have been enough DNA after the hair washing to identify Nash.

## Exoneration

73.     In 2019, Nash filed his Petition for Writ of Habeas Corpus in the Supreme Court of Missouri.  The Supreme Court appointed a Special Master, Judge Rick Zerr, a

Senior Judge from St. Charles County Circuit Court, to hear evidence and make findings of fact and conclusions of law, and to recommend whether or not Nash should be exonerated.  Judge Zerr held three days of evidentiary hearing on March 2, 3, and 5, 2020, and then issued to the Missouri Supreme Court a 217-page report, containing findings and conclusions recommending that Nash's conviction be overturned after spending the last 12 years in jail or prison.

74.    The Supreme Court issued its Order on July 3, 2020, setting aside Nash's conviction, finding that "Donald Nash had met the burden of proof to establish his 'gateway' innocence claim in light of the discredited forensic evidence and the newly discovered DNA evidence."

75.    The Supreme Court set a 30-day deadline for the State to decide whether to retry Nash.  Prior to the end of the 30 days, the Dent County Prosecutor announced he elected to retry Nash based on the same false probable cause statement prepared by Folsom, Mertens, and Taylor.

76.    During the first week of October 2020, however, the prosecution advised Nash's attorneys that the prosecution had further DNA testing done on certain evidence, including on the shoelace used to strangle Spencer.  The new testing found the DNA of two unidentified males on the shoelace, and that Nash was excluded as a contributor.  In addition, the prosecution admitted to Nash's counsel that under new protocols for identifying DNA to a person, the prosecution could no longer say that the DNA found under Spencer's fingernails by the Highway Patrol Lab in March 2008 even belonged to

Nash.   The prosecution advised they could not ethically prosecute Nash.   The State dismissed the charges against Nash on October 9, 2020.

### The Nashes' Damages

77.     Defendants Folsom, Mertens, Taylor, and Montgomery by their conduct deprived Plaintiff Donald Nash of his civil rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and the constitution and laws of the State of Missouri.

78.     Defendants Folsom, Mertens, Taylor, and Montgomery by their conduct deprived Plaintiff Terri Nash of her rights to familial and marital associations under the First and Fourteenth Amendments to the United States Constitution and the constitution and laws of the State of Missouri.

79.     This action seeks damages for the period from March 2008 to each and every year to the present.   Nash's liberty was curtailed upon his arrest and jailing on March 28, 2008.   He remained incarcerated continuously until July 4, 2020, and under house arrest until the charges were dismissed.   The damage suffered by the Nashes began in March 2008 and continued until the present.   Defendants Folsom's, Mertens', Taylor's, and Montgomery's unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Nash to be falsely arrested, wrongfully detained, unfairly tried, wrongfully convicted and incarcerated for more than 12 years for a crime he did not commit.

80.     Defendants Folsom's, Mertens', Taylor's, and Montgomery's unlawful, intentional, willful, deliberately indifferent, reckless and/or bad-faith acts and omissions

caused Nash to suffer injuries and damages which continue to date and will continue into the future, including but not limited to, personal injuries, pain and suffering, severe mental anguish, emotional distress, loss of family relationships and relationship with his wife Terri Nash, severe psychological damage, damage to business and property, legal expenses, loss of income, infliction of physical illness, inadequate medical care, humiliation, indignity and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression for which he is entitled to monetary relief.

81.     Defendants Folsom's, Mertens', Taylor's, and Montgomery's unlawful acts and omissions caused Terri Nash to sustain pecuniary and non-pecuniary damages.  Most important, for over 12 years she was deprived of those benefits one would normally derive from the presence of her husband.  In addition, Terri Nash suffered from loss of consortium, loss of relationship with her husband, loss of society, loss of the companionship and the care of her husband, loss of advice, moral support, family services, attention, protection and financial support, pain and suffering, severe mental anguish, humiliation, degradation, and emotional distress.  Terri Nash also suffered from the stigma of being the wife of a man who was arrested and incarcerated for a brutal murder.  Terri Nash also incurred significant out-of-pocket expenses throughout the time of Nash's arrest and incarceration, including without limitation, legal expenses, visiting expenses, and expenses of providing basic provisions to Nash while he was incarcerated.

82.    These injuries and damages to both Nash and Terri Nash were foreseeable to defendants Folsom, Mertens, Taylor, and Montgomery at the time of their unlawful acts and omissions.

83.    All of the acts and omissions committed by Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, deliberately, with deliberate indifference, and/or with bad faith, and said acts and omissions meet all of the standards for imposition of punitive damages.

84.    All of the acts and omissions of Defendants described in this Complaint were perpetrated while Defendants were acting in their official capacities and under color of law, and violated clearly established rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution.  Such acts and omissions constituted violations of 42 U.S.C. § 1983, as a direct and approximate result of Defendants' actions, Nash was wrongfully arrested, detained, prosecuted, convicted, and incarcerated over the course of more than 12 years and suffered the other grievous injuries and damages set forth above.

## COUNT I

**Plaintiff Donald Nash's § 1983 Claim For Unlawful Arrest and Detention
(Folsom, Mertens, Taylor)**

85.    Plaintiffs hereby incorporate each of the allegations of this complaint set out above as if fully set forth herein and further allege as follows:

86.    Defendants Folsom, Mertens, and Taylor, individually and in concert, deliberately and/or with reckless disregard for the truth, improperly and wrongly prepared and submitted a false probable cause statement to arrest Nash for capital murder.  There

was insufficient probable cause to arrest Nash in the absence of the false statements in the probable cause statement, including the intentional misrepresentation that Nash's DNA could not have remained after Spencer's hair washing. This false probable cause statement caused Nash's wrongful arrest, pretrial detention, conviction, and incarceration.

87.   In arresting Nash and charging him with Spencer's murder, Defendants Folsom, Mertens, and Taylor ignored compelling exculpatory evidence that Nash was not involved in Spencer's murder, failed to investigate in a manner that shocks the conscience and instead followed through with and aided the unlawful prosecution of Nash.

88.   Folsom drafted the false probable cause statement under his own oath against perjury. Mertens and Taylor both reviewed the probable cause statement and either actively or by their silence accepted and joined in the submittal of the probable cause statement which was used to wrongfully arrest, charge, detain, and convict Nash for Spencer's murder. Folsom then created and embellished additional false and baseless evidence to implicate Nash in Spencer's murder and ensure his detention.

89.   Folsom, Mertens, and Taylor took no action or steps to correct the wrong that they had done in preparing and promoting a false probable cause statement. They allowed Nash to remain in jail and prison for over twelve years. In fact, Folsom in the habeas corpus proceeding before the Supreme Court of Missouri, refused to provide a deposition or to accept a subpoena to testify, and stating, through his wife, that even if he were served with a subpoena, he would not honor the subpoena and show up to testify.

90.   The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference

to Nash's federal protective rights and constituted a deprivation of rights under color of state law or statute.  Defendants not only created false reports and fabricated additional evidence to bolster the lack of evidence of Nash's guilt, and they completely ignored the existence of the exculpatory evidence showing that Nash was not involved in Spencer's murder.

91.    As a result of these actions, Nash was deprived of his right against unlawful detention protected under the Fourth and Fourteenth Amendments to the U.S. Constitution and suffered injuries and damages as set forth above.

92.    Defendants' conduct was motivated by evil motive or intent or involved reckless or callous indifference to Nash's federally protected rights, warranting the imposition of punitive damages.  Defendants' conduct was outrageous, intentional, and/or malicious, and punitive damages are warranted to deter similar extreme conduct in the future.

## COUNT II
### Plaintiff Donald Nash's § 1983 Claim For Fabrication of Evidence
### (All Defendants)

93.    Plaintiffs hereby incorporate each of the allegations of this complaint set out above as if fully set forth herein and further allege as follows:

94.    Folsom, Mertens, and Taylor recognized the deficiencies of their case and deliberately fabricated evidence to create a pretense of probable cause and ensure Nash's arrest, detention, prosecution, and conviction for capital murder.

95.    Folsom, Mertens, and Taylor knew and understood that persons who lived together or cohabited were likely to have one another's DNA under their fingernails.  They

27

further realized that this natural phenomenon would make it difficult for them to charge and arrest Nash for the murder of Spencer.  Nevertheless, Defendants Folsom, Mertens, and Taylor came up with a baseless and false theory so that they and the prosecution could contend that all of the Nash's preexisting DNA under Spencer's fingernails would have been washed away.  They had no scientific, factual or other basis for asserting that all Nash's DNA would have been washed away when Spencer washed her hair, but they employed this baseless and false theory to arrest, detain, prosecute, and convict Nash.  They falsely stated in the probable cause statement that none of Nash's DNA would have remained after the hair washing even though they had no scientific, factual or other basis for making such a statement.  They continued to press this false theory through trial.  Folsom, Mertens, and Taylor knew that this assertion was false and unreliable or were reckless in advancing it with callous indifference.

96.     Defendant Folsom further supported and bolstered his probable cause statement in manufacturing other evidence which he contended was an indication of Nash's guilt.  He personally visited Nash to obtain DNA samples from Nash and then also visited him to tell Nash that his DNA was found on the victim and falsely advised Nash that it was found at the crime scene.  He then prepared written reports of his visits with Nash and reported that Nash appeared nervous, and shaking and at times "stared."  He intentionally and deliberately drafted his reports to argue that this conduct by Nash was evidence of his guilt.  At trial he testified about Nash's conduct of being nervous or shaking or stared when Folsom visited him to obtain his DNA samples and to advise him that his DNA was found on the victim and "at the crime scene."  This manufacturing and fabrication of such

evidence by Folsom was intentional, done in bad faith, and showed a callous indifference and evil intent by Folsom to harm Nash.

97.   Montgomery was enlisted to provide false testimony to assist in convicting Nash of Spencer's murder.  Her testimony was critical in convicting Nash.  In her testimony she falsely sought to portray herself as an expert on the effect of washing one's hair on the removal of DNA from under one's fingernails, when, in fact, she was wholly unqualified to testify as an expert on such an issue.

98.   Montgomery never conducted any tests, research, or experiments into the effect of hair washing or eliminating foreign DNA from underneath fingernails.  She never read any literature on the subject.  She has never been involved in any other criminal investigation that analyzed the effect of hair washing on eliminating foreign DNA from beneath fingernails, and she had never before testified in any civil or criminal case on such subject.  The State knew of no other case when anyone has testified about the effect of hair washing on the elimination of foreign DNA from under fingernails.

99.   Montgomery sought to embellish her lack of expertise and experience and to falsely or misleadingly convey to the jury, without any scientific or factual basis, that she expected the hair washing would have a "great effect" in washing away Nash's preexisting DNA.  Montgomery has retracted this false testimony, and the Supreme Court of Missouri has held that it is "discredited."

100.   Montgomery's baseless and false testimony was deliberate, intentional, with callous indifference and was critical in securing Nash's conviction.

29

101.   All of the foregoing acts of Defendants constituted a deprivation of rights under color of state law or statute.

102.   As a result of Defendants' fabrication of evidence, Nash was deprived of his right to due process under the Fourteenth Amendment to the U.S. Constitution and suffered injuries and damages as set forth above.

103.   Defendants' conduct was motivated by evil motive or intent or involved reckless or callous indifference to Nash's federally protected rights, warranting the imposition of punitive damages.  Defendants' conduct was outrageous, intentional, and/or malicious, and punitive damages are warranted to deter similar extreme conduct in the future.

**COUNT III**
**Plaintiff Donald Nash's § 1983 Claim For Failure to Investigate**
**(Folsom, Mertens, Taylor)**

104.   Plaintiffs hereby incorporate each of the allegations of this complaint set out above as if fully set forth herein and further allege as follows:

105.   Folsom, Mertens, and Taylor deliberately, with reckless indifference and/or in bad faith ignored exculpatory physical evidence and failed to investigate other leads and suspects, including ignoring the fact that although Spencer was shot with a shotgun, there was no evidence that Nash ever owned or possessed a shotgun; that Nash was tested hours after the murder for gunshot residue, which test was negative; that the fresh tire tracks found at the abandoned schoolhouse where Spencer's body was found, matched neither Nash's pickup truck nor Spencer's automobile; that fingerprints of a convicted sex offender was found on Spencer's abandoned automobile; that the fingerprints of a person who lived

next door to where the abandoned car was found and who abruptly within a few weeks of the murder, without notice abandoned his wife and young child and quit his job and moved out of town and who expressed concern that his fingerprints may be found on a beer bottle inside Spencer's car.

106.    For years, Feldman and Heyer, and not Nash, were considered the top two suspects in Spencer's murder.  In fact, the evidence against Heyer was so compelling that another law enforcement officer was preparing a probable cause statement to arrest him (and not Nash) at the time of Nash's arrest.  Folsom, in fact, sought to obstruct that law enforcement officer's investigation.

107.    Folsom, Mertens, and Taylor deliberately and/or recklessly decided to focus solely on falsifying evidence based on the discovery of the DNA under Spencer's fingernails and purposefully ignoring all of the other evidence in the case indicating Nash's innocence and pointing to other suspects, as well as the lack of probable cause to arrest Nash.  Their actions shock the conscience.

108.    All of the foregoing acts of these Defendants constituted a deprivation of rights under color of state law or statute.

109.    As a result of these actions, Nash was deprived of his right to due process under the Fourteenth Amendment to the U.S. Constitution and suffered injuries and damages as set forth above.

110.    Defendants' conduct was motivated by evil motive or intent or involved reckless or callous indifference to Nash's federally protected rights, warranting the imposition of punitive damages.  Defendants' conduct was outrageous, intentional, and/or

malicious, and punitive damages are warranted to deter similar extreme conduct in the future.

## COUNT IV
### Plaintiff Donald Nash's § 1983 Claim For Withholding Exculpatory Evidence
### (Mertens)

111.   Plaintiffs hereby incorporate each of the allegations of this complaint set out above as if fully set forth herein and further allege as follows:

112.   One of the two primary suspects for over 26 years, Heyer, had left his fingerprints on the outside of Spencer's vehicle.  He lied about touching the vehicle, acted suspiciously for the next two weeks (including listening to a police scanner about the investigation), and then fled to another state within two weeks, abandoning his family and job without notice.

113.   From the beginning of the case, there has been a question about how a beer can appeared in Spencer's wrecked vehicle since she only left her friend's apartment with a beer bottle (which was also discovered in the vehicle), and because five beer cans were found at the location of Spencer's body.

114.   Just a month before Nash's trial, Mertens received information for the first time that Heyer, one of the two primary suspects for over twenty years, believed that he had left his DNA inside the victim's abandoned car.  Despite the fact that Heyer should have no knowledge of the contents of the vehicle, Heyer specifically expressed concern that his DNA would be on a beer can or beer bottle inside the car.  Before that time, there had never been any physical evidence that Heyer had been inside the car.  In fact, Heyer lied and denied being outside the car.  Moreover, Heyer's pretextual explanation for the

32

beer can—that he dumped his "trash" inside a stranger's vehicle in a ditch outside his house—is absurd and contradicted by the evidence, which is that there was no trash in the vehicle other than the beer can and beer bottle.

115.    The case against Nash was built on a flimsy piece of DNA, combined with false testimony.  There was overwhelming evidence of Nash's innocence.  The existence of DNA implicating a key suspect, which actually placed the suspect inside the deceased victim's vehicle, along with his other suspicious behavior, was material exculpatory evidence in an extremely weak case against Nash that likely would have prevented his wrongful conviction.  Mertens, however, did not disclose this evidence to Nash's defense, and Nash could never present this evidence to the jury, leading to his wrongful conviction for capital murder.  On information and belief, Mertens' father may have destroyed the underlying physical evidence.

116.    All of the foregoing acts of this Defendant constituted a deprivation of rights under color of state law or statute.

117.    Mertens' failure to disclose this material exculpatory evidence was intentional and/or recklessly indifferent.  As a result of Mertens' acts and omissions, Nash was deprived of his right to due process under the Fourteenth Amendment to the U.S. Constitution and suffered injuries and damages as set forth above.

118.    Defendant's conduct was motivated by evil motive or intent or involved reckless or callous indifference to Nash's federally protected rights, warranting the imposition of punitive damages.  Defendant's conduct was outrageous, intentional, and/or

malicious, and punitive damages are warranted to deter similar extreme conduct in the future.

**COUNT V**
**Plaintiff Donald Nash's Claim Under 42 U.S.C. § 1983 For**
**Violations of Rights of Access to Courts**
**(All Defendants)**

119.    Plaintiffs hereby incorporate each of the allegations of this complaint set out above as if fully set forth herein and further allege as follows:

120.    Having secured Nash's wrongful arrest, conviction and incarceration through presentation of a false probable cause statement, fabrication of evidence, willful failure to investigate, suppression or ignoring of exculpatory evidence showing Nash was not involved in the murder of Spencer, and presentation of false and speculative testimony, defendants Folsom, Mertens, Taylor, and Montgomery had a clearly established affirmative obligation to come forward with the truth during each year that Nash was wrongfully detained.  Instead, Defendants intentionally or with reckless indifference and with callous disregard of his federally protected rights, did not disclose their misconduct and Nash's innocence and continued to ignore and suppress the truth through the time of Nash's exoneration in July 2020.

121.    All of the foregoing acts of these Defendants constituted a deprivation of rights under color of state law or statute.

122.    Defendant's conduct directly caused the wrongful conviction and imprisonment of Nash and the repeated denials of his post-conviction requests for relief as well as numerous other damages and physical, emotional and bodily injuries as set forth

above and also caused the damages sustained by Plaintiff Terri Nash as described above. The foregoing acts and omissions of Defendants were deliberate, reckless, wanton, motivated by evil motive or intent, done in bad faith and/or involved callous indifference to Nash's federally protected rights to access to the courts in violation of the Fourth, Fifth, and Fourteenth Amendments.

123.    Defendants' conduct warrants the imposition of punitive damages. Defendants' conduct was outrageous, intentional, and/or malicious, and punitive damages are warranted to deter similar extreme conduct in the future

## COUNT VI

**Plaintiff Donald Nash's 42 U.S.C. § 1985 Civil Rights Conspiracy Claim**

124.    Plaintiffs hereby incorporate each of the allegations of this complaint set forth above as it fully set forth herein and further alleges as follows:

125.    Folsom, Mertens, Taylor, and Montgomery and others yet unknown agreed among themselves and others to act in concert to deprive Nash of his clearly established constitutional rights as protected by the Fourth, Fifth and Fourteenth Amendments including his right not to be arrested and detained without probable cause and to be deprived of his liberty without due process of law.

126.    In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts, including, but not limited to, the following:

(a)    acting in concert to prepare and submit a false probable cause statement used to arrest and charge Nash for Spencer's murder;

35

(b)     acting in concert to construct a false report and testimony that was erroneous and misleading in an attempt to bolster the evidence that was wholly lacking to support Nash's guilt;

(c)     acting in concert to fabricate witness and forensic evidence in attempt to bolster the evidence lacking of Nash's guilt;

(d)     acting in concert to suppress evidence demonstrating Nash's innocence;

(e)     prior to and subsequent to Nash's arrest, detention, charge and conviction, deliberating ignoring and/or recklessly failing to investigate leads pointing  to other suspects and corroborating Nash's innocence.

127.    All of the foregoing acts of these Defendants constituted a deprivation of rights under color of state law or statute.

128.    As a direct and proximate result of Defendants' overt acts, Nash was deprived of his constitutional rights, was wrongfully prosecuted, detrained, and incarcerated for more than 12 years, and subjected to other grievous injuries and damages as set forth above.

## COUNT VII
### Plaintiff Terri Nash's 42 U.S.C. § 1983 Claim For Violation of the Right to Familial and Marital Associations
### (All Defendants)

129.    Plaintiffs hereby incorporate each of the allegations of this complaint as if fully set forth herein and further alleges as follows:

130.   The individual Defendants knew that plaintiff Terri Nash was Nash's wife and that the Nashes enjoyed their family and marital relationship.

131.   By wrongfully arresting, charging and convicting Nash and causing his wrongful incarceration, knowing or having reason to know that he had nothing to do with the crime, Defendants intentionally or with reckless indifference deprived Plaintiff Terri Nash of her right of familial and marital association with her husband.  As a result of Defendants' wrongful and unlawful and intentional actions and conduct, Nash spent more than 12 years in jail and prison, and Terri Nash was effectively denied a marital relationship with Nash during those years.  Because Defendants violated their ongoing affirmative obligation to come forward with evidence of Nash's innocence and the truth of their own misconduct, Defendants denied the Nashes the opportunity to reunite and live together as husband and wife.

132.   All of the foregoing acts of these Defendants constituted a deprivation of rights under color of state law or statute.

133.   Defendants, through their misconduct against Terri Nash, deliberately violated Terri Nash's clearly established First and Fourteenth Amendment rights to be free from unwarranted government interference with her familial and marital relationship with Nash without due process of law.

134.   Defendants' actions were in violation of clearly established constitutional law.  As a direct and proximate result of defendants' actions, Terri Nash suffered grievous and continuing injuries and damages as set forth above.

135.    Defendants' conduct was motivated by evil motive or intent or involved reckless or callous indifference to Terri Nash's federally protected rights, warranting the imposition of punitive damages.  Defendants' conduct was outrageous, intentional, and/or malicious, and punitive damages are warranted to deter similar extreme conduct in the future.

**COUNT VIII**
**Plaintiff Donald Nash's Missouri State Law Claim for False Arrest**
**(Folsom, Mertens, Taylor)**

136.    Plaintiffs hereby incorporate each of the allegations of this complaint as if fully set forth herein, and further allege as follows:

137.    Defendants Folsom, Mertens, and Taylor, acting separately and in concert, individually and in their official capacities, did willfully, unlawfully, maliciously and without probable cause or legal justification cause Nash to be arrested, detained, charged, and confined for the murder of Spencer.

138.    Folsom, Mertens, and Taylor all encouraged, caused, promoted, or instigated the arrest by taking part in preparing a false probable cause statement against Nash falsely claiming that none of Nash's DNA would have remained after Spencer's hair washing and, therefore, he killed her.  This statement was false, without scientific or factual or other support.  Defendants Folsom, Mertens, and Taylor engaged in this course of conduct without concern for or consideration of Nash's perceived guilt or innocence and for no purpose related to any legitimate prosecutorial concerns.  Folsom, Mertens, and Taylor's false statement and affidavit of probable cause was prepared and presented in callous disregard and deliberate indifference while ignoring the fact that for 26 years investigators

who investigated Spencer's murder found no evidence of probable cause to arrest or charge Nash with murder and these Defendants further ignored exculpatory evidence pointing to Nash's innocence.

139.    All of the foregoing acts of these Defendants constituted a deprivation of rights under color of state law or statute.

140.    As a direct and proximate result of Nash's false arrest, he was wrongfully detained and incarcerated and served more than 12 years for crimes he did not commit and suffered the additional physical emotional and pecuniary damages as described above.

141.    Defendants' conduct was motivated by evil motive or intent or involved reckless or callous indifference to Nash's rights, warranting the imposition of punitive damages.  Defendants' conduct was outrageous, intentional, and/or malicious, and punitive damages are warranted to deter similar extreme conduct in the future.

**COUNT IX**
**Plaintiff Donald Nash's Missouri State Law Claim for Malicious Prosecution**
**(All Defendants)**

142.    Plaintiffs hereby incorporate each of the allegations of this complaint as if fully set forth herein, and further alleges as follows:

143.    Folsom, Mertens, Taylor, and Montgomery, acting separately and in concert, individually and in their official capacities, did willfully, unlawfully, maliciously and without probable cause or legal justification cause Nash to be prosecuted, detained and incarcerated for the murder of Spencer.

144.    Based upon the lack of evidence that Nash was involved in the murder of Spencer, the fact that for 26 years several investigators in the Dent County Sheriff's Office

and the Highway Patrol investigated the murder of Spencer and found no evidence amounting to any probable cause that Nash was involved in the Spencer murder, the fact that several of those investigators believed Nash was innocent, the fact that there were two suspects with criminal records whose fingerprints were found on Spencer's abandoned car, and the facts of other exculpatory evidence, including Nash did not own or possess a shotgun, was subjected to a gun residue test that was negative, had no scratches or other evidence that he was involved in a struggle with anyone, and the tire tracks at the scene where the victim's body was found that did not match either Nash's truck or Spencer's automobile.

145.   Nevertheless, without probable cause, Defendants caused the commencement and continuance of prosecution proceedings against Nash.  Defendants' conduct was actuated and continued without any proper motive and with malice. Defendants fabricated false evidence and disregarded and concealed exculpatory evidence. Montgomery, in particular, erroneously and falsely portrayed herself as an expert on the elimination of DNA by hair washing without scientific or other reliable basis, and testified that the hair washing of Spencer the night before she was killed would have had a great effect in washing away any of Nash's preexisting DNA present prior to the hair washing. She so testified, knowing that she had no scientific or reliable basis for so testifying.

146.   More than 12 years after defendants maliciously caused the commencement and continuation of a false and malicious prosecution against Nash, the proceedings were terminated in Nash's favor through his exoneration by the Supreme Court of Missouri on July 3, 2020 and by the prosecution dismissing the case against Nash on October 9, 2020.

The Supreme Court in its Order of July 3, 2020 setting aside the conviction of Nash found that he had satisfied the gateway test for actual innocence.   Nash was released from confinement on July 4, 2020.

147.   All of the foregoing acts of these Defendants constituted a deprivation of rights under color of state law or statute.

148.   As a direct and proximate result of Defendants' malicious prosecution of Nash, Nash was wrongfully detained and incarcerated and served more than 12 years for a crime he did not commit and suffered the physical, emotional, and pecuniary damages as described above.

149.   Defendants' conduct was motivated by evil motive or intent or involved reckless or callous indifference to Nash's rights, warranting the imposition of punitive damages.   Defendants' conduct was outrageous, intentional, and/or malicious, and punitive damages are warranted to deter similar extreme conduct in the future.

**COUNT X**
**Plaintiff Donald Nash's Missouri State Law Claim for Abuse of Process**
**(All Defendants)**

150.   Plaintiffs hereby incorporate each of the allegations of this complaint as if fully set forth herein and further allege as follows:

151.   Defendants, acting separately and in concert, individually and in their official capacities, made an illegal, improper, and perverted use of process, namely the arrest, detention, charging, and prosecution of Nash for a crime he did not commit.

152.   Defendants knew that the use of such process was neither warranted nor authorized because they lacked probable cause and knew or had reason to know that Nash

was innocent.  As a result, Defendants abused the legal system by fabricating evidence to manufacture a basis for his arrest, detention, prosecution, and conviction.

153.   All of the foregoing acts of these Defendants constituted a deprivation of rights under color of state law or statute.

154.   As a direct and approximate result of Defendants' abuse of process, Nash was wrongfully detained and incarcerated and served more than 12 years for crimes he did not commit, and he suffered the additional physical, emotional and pecuniary damages as described above.

155.   Defendants' conduct was motivated by evil motive or intent or involved reckless or callous indifference to Nash's rights, warranting the imposition of punitive damages.  Defendants' conduct was outrageous, intentional, and/or malicious, and punitive damages are warranted to deter similar extreme conduct in the future.

## COUNT XI
## Plaintiff Donald Nash's Missouri State Law Claim
## for Intentional Infliction of Emotional Distress
## (All Defendants)

156.   Plaintiffs hereby incorporate each of the allegations of this complaint as if fully set forth herein and further allege as follows:

157.   Defendants acting separately and in concert, individually and in their official capacities, did intentionally, maliciously, and with reckless disregard and deliberate indifference to Nash's rights, engage in extreme and outrageous conduct in connection with the unlawful arrest, detention, charging, and prosecution of Nash including, without

limitation, failing to reasonably investigate, fabricating evidence, presenting false testimony, failing to investigate other suspects, and ignoring exculpatory evidence.

158. Defendants acted to cause extreme emotional distress and, in fact, did cause Nash to suffer severe emotional distress that resulted in bodily harm and injury.

159. Defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

160. All of the foregoing acts of these Defendants constituted a deprivation of rights under color of state law or statute.

161. As a direct and proximate result of Defendants' joint, extreme and outrageous behavior, plaintiff Nash was wrongfully arrested, detained, prosecuted, and incarcerated and served more than 12 years in confinement and suffered severe emotional distress for which he is entitled to damages.

162. Defendants' conduct was motivated by evil motive or intent or involved reckless or callous indifference to Nash's rights, warranting the imposition of punitive damages. Defendants' conduct was outrageous, intentional, and/or malicious, and punitive damages are warranted to deter similar extreme conduct in the future.

## COUNT XII
### Plaintiff Donald Nash's Missouri State Law Claim
### for Negligent Infliction of Emotional Distress
### (All Defendants)

163. Plaintiffs hereby incorporate each of the allegations of this complaint as it fully set forth herein and further allege as follows:

164.     Defendants, acting separately and in concert, individually and in their official capacities, realized or should have realized that their conduct of fabricating evidence, withholding exculpatory evidence, and facilitating Nash's wrongful arrest, detention, prosecution, and conviction involved an unreasonable risk of causing emotional distress to Nash.

165.     All of the foregoing acts of these Defendants constituted a deprivation of rights under color of state law or statute.

166.     As a direct and proximate result of Defendants joint and several unreasonable behavior, Nash suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant for which he is entitled to damages.

167.     Defendants' conduct was motivated by evil motive or intent or involved reckless or callous indifference to Nash's rights, warranting the imposition of punitive damages.  Defendants' conduct was outrageous, intentional, and/or malicious, and punitive damages are warranted to deter similar extreme conduct in the future.

## COUNT XIII
## Plaintiff Donald Nash's Missouri State Law Claim for Civil Conspiracy
## (All Defendants)

168.     Plaintiffs hereby incorporate each of the allegations of this complaint as it fully set forth herein and further allege as follows:

169.     Defendants and other persons yet unknown agreed among themselves and others to act in concert with the unlawful objective of depriving Nash of his constitutional rights as protected by the U.S. and Missouri Constitutions, including his right not to be deprived of liberty without due process of law.

44

170.   All of the acts in furtherance of this conspiracy constituted a deprivation of rights under color of state law or statute.  Specifically, these Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including, but not limited to, the following:

(a)   Acting in concert to prepare and submit and follow through with a false affidavit of probable cause, asserting that Nash was guilty of the murder of Spencer when they knew or should have known that he was not involved in Spencer's murder.

(b)   Acting in concert to endorse the false testimony of Folsom and Montgomery.

(c)   Acting in concert to fabricate witness and purported forensic evidence to bolster the lack of evidence of Nash's guilt prior to and subsequent to Nash's arrest, charge and conviction, deliberately ignoring and/or recklessly failing to investigate evidence pointing to other suspects involved in Spencer's murder and corroborating Nash's innocence.

(d)   As a direct and proximate result of defendants' overt acts, Nash was deprived of his constitutional rights, wrongfully prosecuted, detained and incarcerated for more than 12 years, and subjected to other grievous injuries and damages as set forth above.

## COUNT XIV
### Plaintiff Terri Nash's Missouri Common Law Claim of Loss of Consortium
### (All Defendants)

171.   Plaintiff hereby incorporates each of the allegations set out above of this complaint as if fully set forth herein and further alleges as follows:

172.   Terri Nash was married to Nash at the time of his arrest in 2008, during his confinement in jail, and during his long confinement in the Missouri Department of Corrections.  Donald Nash and Terri Nash are still married.  As a result of the tortious, and unlawful conduct of Defendants set forth above, Terri Nash has been deprived of the services, society, companionship, assistance with household chores, care, love, felicity, comfort, affection and conjugal rights that would normally be available but for the arrest, conviction and imprisonment of her husband.

173.   All of the acts of the Defendants constituted a deprivation of rights under color of state law or statute.

174.   As a result of the conduct of Defendants described in this complaint, Terri Nash has suffered a loss of consortium and suffered the physical, emotional and pecuniary damages as described above in this Complaint.

### PRAYER FOR DAMAGES

175.   As a direct and proximate result of Defendants' conduct described above, Nash was deprived of his constitutional rights, wrongful arrested and prosecuted, detained and incarcerated for more than 12 years and subjected to other grievous injuries and damages as set forth above.  Further, plaintiff Terri Nash was also subjected to the loss of consortium and other grievous injuries and damages as set forth above.

WHEREFORE, Plaintiffs Donald Nash and Terri Nash respectfully request:

(a)     A trial by jury of Plaintiffs' claims;

(b)     That the Court award compensatory damages to Donald Nash and against Defendants, jointly and severally, in an amount determined at trial;

(c)     That the Court award compensatory damages to Terri Nash and against Defendants in an amount to be determined at trial;

(d)     That the Court award punitive damages to Plaintiffs and against Defendants in an amount to be determined at trial in order to deter such conduct by Defendants in the future;

(e)     That the Court award Plaintiffs pre-judgement and post-judgment interest, attorney fees and recovery of loss including reasonable attorney fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims and Missouri State law claims, and

(f)     That the Court award Plaintiffs such other and further relief to which plaintiffs may be entitled.

Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

/s/ Charles A. Weiss
Charles A. Weiss, MO #20299
caweiss@bclplaw.com
Stephen R. Snodgrass, MO #29017
srsnodgrass@bclplaw.com
Jonathan Potts, MO #64091
jonathan.potts@bclplaw.com

One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, MO  63102-2750
Telephone:  (314) 259-2000
Facsimile:  (314) 552-8215

*ATTORNEYS FOR PLAINTIFFS*
*DONALD AND TERRI NASH*