UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DONALD NASH, et al., | ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) Case No. 4:21CV495 JCH |
| HENRY JAMES FOLSOM, et al., | ) ) ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Henry James Folsom's Motion for Summary Judgment, and Defendants Scott Mertens, Ruth Montgomery, and Dorothy Taylor's Motion for Summary Judgment, filed May 24, and May 31, 2022, respectively. (ECF Nos. 49, 52). The motions are fully briefed and ready for disposition.

**BACKGROUND**

In March, 1982, Plaintiff Donald Nash's live-in girlfriend, Judy Spencer, was murdered outside Salem, Missouri. (Defendant Folsom's Amended Statement of Uncontroverted Material Facts in Support of Motion for Summary Judgment[1] ("Defendants' Facts"), ¶¶ 1, 2). The evening of the murder, the couple had a brief, non-violent argument outside a friend of Spencer's apartment about Spencer's drinking and driving.[2] (*Id.*, ¶ 3 and Plaintiffs' response thereto; Plaintiffs' Additional Facts in Response to Defendants' Statement of Uncontroverted Material Facts ("Plaintiffs' Additional Facts"), ¶ 2). After the argument Nash left Spencer at Jones'

---

[1] Defendants Mertens, Montgomery and Taylor adopted by reference Defendant Folsom's statement of material facts and exhibits. (*See* ECF No. 54).
[2] Spencer's friend was Janet Jones. (Plaintiffs' Response to Defendants' Facts, ¶ 4).

- 1 -

apartment, and returned to the home he shared with Spencer. (Amended Compl., ¶ 15). Spencer eventually returned home as well, to change clothes, and then drove back to Jones' apartment. (Defendants' Facts, ¶¶ 6, 7). At some point during these events, Spencer washed her hair in Jones' kitchen sink. While Plaintiffs assert she did so before returning to the home she shared with Nash, Defendants maintain it was after Spencer returned to Jones' apartment. (*Id.*, and Plaintiffs' responses thereto).[3] Spencer continued drinking upon her return to Jones' apartment, and ultimately departed alone to drive to bars in Houston, Missouri, a nearby town. (*Id.*, ¶ 8; Plaintiffs' Additional Facts, ¶ 5).

Nash telephoned Jones multiple times, and expressed concern that Spencer would get into a car accident or be arrested as a result of her drinking and driving. (Defendants' Facts, ¶ 10; Plaintiffs' Additional Facts, ¶ 4). Both Nash and Jones went looking for Spencer separately, but neither found her. (Defendants' Facts, ¶ 11; Plaintiffs' Additional Facts, ¶¶ 6, 7).

Spencer's body was found the following day by two farmers at an abandoned schoolhouse outside Salem. (Defendants' Facts, ¶ 12; Amended Compl., ¶ 19). The killer had strangled Spencer with a shoelace taken from her left shoe, and then shot her in the neck with a shotgun. (*Id.*; Amended Compl., ¶ 20). Spencer was partially nude, indicating the murder was sexually motivated, and she had a blood alcohol content of 0.18 percent. (Amended Compl., ¶ 19). An original investigator measured fresh tire tracks at the scene as 7 ½ inches wide, and 70 inches from the inside of the tires from left to right. (Amended Compl., ¶ 22; Plaintiffs'

---

3 Defendants' contention seemingly contradicts Folsom's probable cause affidavit, in which he stated that Spencer washed and restyled her hair prior to leaving Jones' residence and arriving at her and Nash's home. (*See* Defendants' Exh. 1, ECF No. 51-1).

Additional Facts, ¶ 14).[4]  Spencer's car was found in a ditch, many miles away from the schoolhouse and in the opposite direction from Salem. (Amended Compl., ¶ 23).

Nash was told of Spencer's death by investigators at the hospital on March 11, 1982. (Plaintiffs' Additional Facts, ¶ 9). According to one of the investigators who interviewed Nash, he appeared to be very upset at the news and began to cry. (*Id.*). Jones also testified that the next time she saw Nash, he appeared "broken-hearted." (*Id.*).

No eyewitness purported to connect Nash to the crime, and no physical evidence ever placed him at the abandoned schoolhouse or the ditch where Spencer's car was found. (Amended Compl., ¶¶ 25, 32). Investigators administered a gunshot residue test on Nash, to see if he had recently handled a shotgun, but the test was negative. (*Id.*, ¶ 27).[5]  Paul Mertens[6] of the Missouri State Highway Patrol testified that during the test, he observed no scratches, scrapes, marks or bruises on Nash's face or hands that would indicate he had been in a violent struggle. (Plaintiffs' Additional Facts, ¶ 11). Investigators also found fingerprints on the front-side windows of Spencer's abandoned car that belonged to two men: a violent sex offender (Lambert Anthony Feldman III), and another man who lived next to the ditch (Alfred John Heyer III).[7] (Amended Compl., ¶ 24). After some investigation, the case went cold for over twenty-five years, and between 1982 and 2008, Nash was not charged with murder. (*Id.*, ¶ 28).[8]

---

4 According to Plaintiffs, at the time of the murder Nash owned a 1979 K-10 pickup, and Spencer owned a 1976 Oldsmobile sedan. The tire tracks at the schoolhouse did not belong to Nash's truck or Spencer's car, and the vehicle that left the tire tracks remains unidentified. (Amended Compl., ¶ 22).
5 Nash voluntarily submitted to the gunshot residue test. (Plaintiffs' Additional Facts, ¶ 10). He did not own or have access to a shotgun. (*Id.*, ¶ 17; Amended Compl., ¶ 20).
6 Paul Mertens is the father of Defendant Scott Mertens.
7 Nash's fingerprints were not found on Spencer's car. (Amended Compl., ¶ 24).
8 Investigators conceded they did not have probable cause to file charges against Nash during that period. (Amended Compl., ¶ 28; Plaintiffs' Additional Facts, ¶ 17).

Defendants Folsom, Mertens and Taylor of the Missouri State Highway Patrol began investigating Spencer's murder in 2007 after Spencer's sister, Jeanne Paris, contacted Folsom and asked him to look into the death. (Plaintiffs' Additional Facts, ¶ 15).[9] Folsom retrieved the Missouri State Highway Patrol's entire file on the case, which contained the negative gunshot residue test, and did not contain evidence that Nash or his truck was ever at the abandoned schoolhouse. (*Id.*, ¶ 16, 17). In November, 2007, items of evidence were submitted to the Missouri State Highway Patrol crime lab for forensic examination. (Defendants' Facts, ¶ 19). A mixture of an unidentified male DNA and Spencer's DNA[10] were found under the left-hand fingernails of Spencer, one of which was broken.[11] (*Id.* and Plaintiffs' response thereto). On March 19, 2008, Defendant Montgomery concluded that the DNA comparison was consistent with Nash's DNA profile at five loci. (*Id.*, ¶ 20 and Plaintiffs' response thereto). According to Defendants, when asked about the DNA evidence Nash offered no explanation, appeared visibly shaken, and was trembling and clenching his fists. (*Id.*, ¶ 21). Defendants further assert that when asked if he killed Spencer, Nash looked at the ground, did not make eye contact, and said "No." (*Id.*). Plaintiffs counter that these statements rely on inadmissible hearsay contained in a police report prepared by Defendant Folsom. (Plaintiffs' Response to Defendants' Facts, ¶ 21).

---

9 Folsom testified that Paris and Darla Spencer, her sister-in-law, began calling every day and filling his voicemail, to the point where "it was becoming a hindrance." (Plaintiffs' Additional Facts, ¶ 22). He implied that they tested the DNA in an effort to appease Paris and Darla Spencer. (*Id.*).
10 The total amount of the mixture was 5 billionths of a gram, and in 2020 the State admitted the male DNA sample was not robust enough for an expert to testify reliably that it belonged to Nash. (Amended Compl., ¶¶ 29, 31).
11 Defendants maintain a broken, jagged fingernail is indicative of a physical struggle. (Defendants' Facts, ¶ 19). Plaintiffs counter that there is no evidence Nash and Spencer engaged in a physical altercation or struggle. (Plaintiffs' Response to Defendants' Facts, ¶ 19).

They further quote from the Special Master's Amended Report[12], in which he explained as follows:

> The Master concludes that reasonable jurors would still have reasonable doubt in light of very weak evidence like the fact that Nash was supposedly "shaking" when he spoke with Sergeant Folsom, or the fact that Nash's timeline has been questioned based on hearsay contained in police reports written nearly a month apart. All of this "evidence" is consistent with the behavior of a concerned boyfriend and an innocent person who suddenly finds himself pulled back into a 26-year-old murder case. In another case, each piece of so-called "incriminating" evidence might be a blip in the record. The reason that the [State] places so much attention on issues like an allegedly inconsistent statement in a police report is not because that evidence is ***strong***, but rather because the [State] has nothing else to rely upon.

(*Id.*, quoting Plaintiffs' Exh. D, Amended Report of the Special Master, P. 153).

At some point during the investigation Taylor proposed the idea that Spencer's hair washing would have affected the DNA under her fingernails. (Plaintiffs' Additional Facts, ¶ 23). Folsom therefore called Montgomery, a former employee of the Missouri State Highway Patrol Crime Lab, and asked whether the washing would have removed DNA from underneath Spencer's fingernails. (*Id.*). According to Folsom, Montgomery said "yes, it would have removed it, that the DNA could not have remained under the fingernails." For her part, Montgomery acknowledges that at the time the probable cause affidavit was executed, and further to date, she has never been involved in any other criminal investigation that concerned the effect of hair washing on fingernail DNA. (*Id.*, ¶ 36). She has received no training on the subject, and has neither conducted scientific research nor become aware of "any scientific

---

12 In response to Nash's filing a Petition for Writ of Habeas Corpus in 2019, the Missouri Supreme Court appointed a Special Master to hear evidence and make findings of fact and conclusions of law, and to recommend whether or not Nash should be exonerated. (Amened Compl., ¶ 73). The Special Master held three days of evidentiary hearing in 2020, and then issued a 217-page report.

research, either published or unpublished, on the effect of a single hair washing on fingernail DNA." (*Id.*).

Defendant Folsom then prepared a probable cause affidavit, in which he stated that "this DNA could not have remained present during hair washing nor was it reportedly transferred during casual contact with Doc Nash.  This mixture of DNA is often normally the result of a physical struggle."  (Defendants' Facts, ¶ 22).  Folsom testified that prior to preparing the probable cause affidavit he spoke with Montgomery, because he "wanted to get Ruth's verbiage…about the DNA perfect and consistent with what she was saying because everything hinged on that." (*Id.*, ¶ 23; Plaintiffs' Additional Facts, ¶ 24).[13]  Folsom testified that he "did not feel that it was a strong criminal case," and that "the entire case hinged on the DNA." (Plaintiffs' Additional Facts, ¶ 27).  He further stated it "felt like the probable cause was 50/50," but added that he believed the case should go to a jury.  (*Id.* and Defendants' response thereto).[14]

Prior to submitting the probable cause affidavit, the only witnesses Folsom interviewed were Jeanne Paris, Darla Spencer, and Eddie Wilson, the son of the coroner who took the fingernail clippings.  (Plaintiffs' Additional Facts, ¶ 18).  Neither he, Taylor nor Mertens interviewed any other suspects, including Feldman and Heyer, whose fingerprints were found on Spencer's car.  (*Id.*).[15]

---

[13] Montgomery denies providing the verbiage, and further claims she "told no one in this case that all the DNA would be removed from under [Spencer's] fingernails because of washing her hair." (Plaintiffs' Additional Facts, ¶ 40).

[14] It is undisputed that the probable cause affidavit did not reference the absence of gunshot residue on Nash, the lack of evidence that Nash possessed or had access to a shotgun, the lack of evidence of a physical altercation, or the fingerprint evidence regarding Feldman and Heyer. (Plaintiffs' Additional Facts, ¶ 35).

[15] Plaintiffs present evidence that Tim Bell, an investigator in the Dent County's Sheriff's Office, felt strongly that Feldman had committed the murder, and that Steven Lawhead, another

Within eight days, Nash was charged with capital murder. During the eventual trial, Montgomery testified that the quantity of DNA extracted from under Spencer's fingernails was not consistent with a low level, low quantity such as from casual contact. (Defendants' Facts, ¶ 24).[16]

In October, 2009, Nash was convicted of capital murder. (Amended Compl., ¶ 1). He spent twelve years in prison until the Missouri Supreme Court, relying on a 217-page report issued by a Special Master, set aside his conviction in July, 2020. (*Id.*, ¶¶ 1, 73-74). After further DNA testing on the shoelace utilized to strangle Spencer excluded Nash as a contributor, the State dismissed the charges against Nash on October 9, 2020. (*Id.*, ¶ 76).

Plaintiffs filed their original Complaint in this matter against Defendants Folsom, Mertens, Taylor and Montgomery on April 28, 2021. In their Amended Complaint, filed May 25, 2021, Plaintiffs assert the following federal law claims: 42 U.S.C. §§ 1983 and 1985 claims for unlawful arrest and detention against Folsom, Mertens and Taylor (Count I), fabrication of evidence against all Defendants (Count II), failure to investigate against Folsom, Mertens and Taylor (Count III), withholding exculpatory evidence against Mertens (Count IV), violations of rights of access to courts against all Defendants (Count V), civil rights conspiracy against all Defendants (Count VI), and violation of the right to familial and marital associations against all Defendants (Count VII). They further assert Missouri state-law claims, as follows: false arrest

---

investigator in the Dent County Sheriff's Office, was focused on Heyer as a subject. (Plaintiffs' Additional Facts, ¶¶ 43-59).

[16] Plaintiffs do not dispute that Montgomery so testified. They note, however, that Nash and Spencer lived together, and Defendants acknowledge that people who live together commonly have each other's DNA underneath their fingernails. (Plaintiffs' Response to Defendants' Facts, ¶ 24; Plaintiffs' Additional Facts, ¶ 20). Furthermore, Montgomery now admits that she is not aware of any forensic DNA scientist who has accepted her theory that washing hair with a detergent-based shampoo would have a "great effect" on fingernail DNA, and that her "great effect" opinion is not supported by the current state of scientific knowledge. (Plaintiffs' Additional Facts, ¶¶ 41, 42).

against Folsom, Mertens and Taylor (Count VIII), malicious prosecution against all Defendants (Count IX), abuse of process against all Defendants (Count X), intentional infliction of emotional distress against all Defendants (Count XI), negligent infliction of emotional distress against all Defendants (Count XII), civil conspiracy against all Defendants (Count XIII), and loss of consortium against all Defendants (Count XIV).[17]

As noted above, Defendant Folsom filed his Motion for Summary Judgment on May 24, 2022, and Defendants Mertens, Montgomery, and Taylor filed their Motion for Summary Judgment on May 31, 2022. (ECF Nos. 49, 52).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id*.

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its

---

17 Counts I-VI, and VIII-XIII are asserted by Plaintiff Donald Nash. Counts VII and XIV are asserted by Plaintiff Theresa Nash.

pleadings. *Anderson*, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id*. at 249.

## DISCUSSION

### I. Unlawful Arrest And Detention (Count I)

As noted above, in Count I of the Amended Complaint Plaintiff Donald Nash sets forth a claim for unlawful arrest and detention against Defendants Folsom, Mertens and Taylor. (Amended Compl., ¶¶ 85-92). Specifically, he claims that Defendants Folsom, Mertens and Taylor intentionally and/or with reckless disregard for the truth included false statements in the probable cause statement, including the intentional misrepresentation that Nash's DNA could not have remained after Spencer's hair washing; ignored and omitted compelling exculpatory evidence that Nash was not involved in Spencer's murder; and failed to investigate in a manner that shocks the conscience. (*Id.*, ¶¶ 86, 87).

"'The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause.'" *Faria v. McCarrick*, No. 4:16CV1175 JAR, 2019 WL 4695993, at *6 (E.D. Mo. Sept. 26, 2019) (quoting *Manuel v. City of Joliet, Ill.*, 137 S.Ct. 911, 918 (2017)). "Probable cause exists when the facts and circumstances are 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" *Id.* (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111-12 (1975) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964))). To challenge probable cause in the context of an arrest warrant, a plaintiff must show "(1) police deliberately or recklessly included a false statement, or omitted a truthful statement from the

[probable cause] affidavit; and (2) the affidavit would not establish probable cause if the allegedly false information is ignored or the omitted information is supplemented." *Dowell v. Lincoln Cty., Mo.*, 762 F.3d 770, 777 (8th Cir. 2014) (internal quotation marks and citation omitted). "An officer is entitled to qualified immunity if he had 'merely *arguable* probable cause,' which is a mistaken but objectively reasonable belief that the suspect committed a criminal offense." *Id.* (quoting *McCabe v. Parker*, 608 F.3d 1068, 1078 (8th Cir. 2010)).

In applying the *Dowell* standard, the Court first must ask whether the probable cause statement included false information or omitted true information. Defendant Folsom's Probable Cause Statement states in relevant part as follows:

> On March 11, 1982, the body of Judy Spencer, age 21, was discovered deceased approximately 8.3 miles west of Salem, Missouri, behind the Old Bethlehem School just off Missouri 32 Highway. The victim who was partially nude was discovered hidden in an old outhouse foundation, which was covered with logs and other debris. It was later determined that Judy Spencer was strangled with a shoelace and subsequently shot in the neck with a shotgun. Additionally, it appeared that the victim had possibly been sexually assaulted.
>
> An examination of the crime scene revealed a set of fresh tire tracks, which appeared to have been made by a van or truck. Several items of clothing were found a short distance from the outhouse foundation, which were later determined to have belonged to the victim. Additionally, it was determined that Judy Spencer had died as a result of being strangled with a shoelace from her right shoe. An examination of the body was conducted and several items of physical evidence were recovered from the victim, including fingernail clippings from both hands.
>
> A subsequent investigation revealed that Judy Spencer had been in two separate verbal arguments with Donald "Doc" Nash her boyfriend a short time prior to her disappearance in the evening hours of March 10, 1982. The first verbal argument occurred at approximately 1900 hours at the residence of Janet Jones in Salem, Missouri. During the course of this verbal argument Doc Nash reportedly stated, "That will be the last time you lie to me bitch." A short time later, Judy Spencer reportedly told Janet Jones, "He thinks I am ugly. He doesn't like my hair this way." After this initial verbal argument, it was reported by Janet Jones that Judy

Spencer washed her hair and restyled it prior to leaving Janet Jones' residence.  It is also reported that a short time later, Judy Spencer arrived at her and Doc Nash's residence where a second verbal argument ensued.  At the conclusion of this second verbal argument, which occurred within an hour of the first verbal argument, Judy Spencer left the residence and returned to Janet Jones' residence, where she invited Janet Jones to travel with her to Houston, Missouri, which Janet Jones declined.  During the course of the investigation, at no point was it determined that the arguments between Judy Spencer and Doc Nash were anything but verbal in nature.

In March of 1982, Doc Nash was interviewed concerning the death of Judy Spencer.  He acknowledged that he had been in two verbal arguments the day of Judy Spencer's disappearance.  Doc Nash stated that he had searched for Judy Spencer until approximately 2130 hours on March 10, 1982.  It was later determined that Doc Nash had not been truthful concerning the extent of how late he searched for Judy Spencer, as it was later determined by witness statements that he had searched for her until 0030 hours on March 11, 1982.  In a subsequent interview, Doc Nash invoked his right to legal counsel and was not further questioned concerning the investigation.

In November of 2007, the undersigned officer submitted several items of physical evidence collected in the year of 1982, by the original investigating officers to the Missouri State Highway Patrol Crime Laboratory for forensic examination.  A forensic examination of this evidence resulted in an unidentified male's DNA profile being discovered under the fingernail clippings taken from the left hand of [] Judy Spencer.  Additionally, it was also determined that at least one of these fingernails was broken and was in a jagged condition, which would be indicative of a physical struggle.

On March 13, 2008, the undersigned officer contacted Doc Nash at his residence in Beaufort, Missouri, and obtained a voluntary buccal swab of Doc Nash's DNA for a comparison examination.  On 19 March 2008, it was determined by the Missouri State Highway Patrol's Crime Laboratory that Doc Nash's DNA was matched to a DNA profile identified from the left hand fingernail clippings of Judy Spencer originally taken as evidence in March of 1982.  It was further determined that a mixture of Judy Spencer's DNA and Doc Nash's DNA was found under the left hand fingernails of Judy Spencer and this DNA could not have remained present during hair washing nor was it reportedly transferred during casual contact with Doc Nash.  This mixture of DNA is often normally the result of a physical struggle.

> On March 26, 2008, a non-custodial interview was conducted of Doc Nash at his residence by the undersigned officer wherein he offered no explanation as to why his DNA profile was identified as being under the fingernails of Judy Spencer. Additionally, Doc Nash indicated that he drove a Chevrolet pickup truck at the time of Judy Spencer's murder. It should be noted that a short time after the interview began Doc Nash subsequently terminated the interview.

(Defendants' Exh. 1, ECF No. 51-1).

In their response to Defendants' motions, Plaintiffs assert that Defendants included false statements in the probable cause affidavit. Specifically, they point to the following: "It was further determined that a mixture of Judy Spencer's DNA and Doc Nash's DNA was found under the left hand fingernails of Judy Spencer and this DNA could not have remained present during hair washing nor was it reportedly transferred during casual contact with Doc Nash. This mixture of DNA is often normally the result of a physical struggle." According to Plaintiffs, at present no Defendant contends these statements are true, and the Special Master specifically found the statements were false. They maintain that Defendants' inclusion of the statements was reckless, as the Special Master found DNA evidence was key to the case, and Folsom, Taylor and Mertens all understood that people who live together frequently have each other's DNA under their fingernails. Finally, with respect to the now discredited (or partially discredited) "hair washing theory," *i.e.*, that Spencer's shampooing her hair would have removed any of Nash's DNA and so Nash and Spencer must have had a physical altercation following the washing, Defendants maintain they were not DNA experts at the time they prepared the affidavit, but instead relied on verbiage from Montgomery.[18]

Defendants respond that none of the above statements was intentionally false when provided in the affidavit. As noted by Plaintiffs, however, the *Dowell* standard includes

---

[18] For her part, Montgomery claims not to be an expert either, and further denies telling Folsom that all DNA would be removed from under Spencer's fingernails as a result of washing her hair.

recklessness. Upon consideration, the Court finds that whether or not including the statements constituted recklessness is a genuine issue of material fact that precludes determination as a matter of law that probable cause existed. *See Faria*, 2019 WL 4695993, at *7 (citing *Hoffmeyer v. Porter*, 758 F.3d 1065, 1068 (8th Cir. 2014) and *Giordano v. Lee*, 434 F.2d 1227, 1230 (8th Cir. 1970), for the proposition that the existence of probable cause is a question for the jury in § 1983 actions if a genuine issue of material fact exists).

Defendants next assert the probable cause statement would have been enough even absent the challenged statements. As noted above, the *Dowell* standard contemplates reconstructing the probable cause statement, and both excluding false statements and including exculpatory true statements. *See Id.* at 777 (internal quotation marks and citation omitted) ("To challenge probable cause, a plaintiff must show (1) police deliberately or recklessly included a false statement, or omitted a truthful statement from the [probable cause] affidavit; and (2) the affidavit would not establish probable cause if the allegedly false information is ignored or the omitted information is supplemented."). The Court thus turns to consideration of whether a reconstructed probable cause statement omitting false statements and including exculpatory evidence would have established probable cause.

Absent the statements regarding hair washing removing residual DNA from Nash, the following inculpatory facts remain: Nash and Spencer had two non-violent arguments a short time prior to her disappearance, that took place miles away from where Spencer's body was eventually discovered; Nash lied or at least misspoke regarding the timing of his search for Spencer; at some point Nash invoked his right to legal counsel; DNA belonging to Nash was found under Spencer's fingernails, at least one of which was in a jagged condition, potentially indicating a physical struggle (although the parties agree that persons who live together often

have each other's DNA underneath their fingernails); and Nash admitted he drove a Chevrolet pickup truck at the time of Spencer's murder.

According to Plaintiffs, the following exculpatory facts should have been included in the probable cause statement: although Spencer was shot with a shotgun, the gunshot residue test performed on Nash was negative, and people agreed (and it was substantiated in the case file) that Nash did not own a shotgun; there was no evidence that Nash or his truck was ever at the abandoned schoolhouse where Spencer's body was found; the tire track measurements taken at the schoolhouse confirmed they did not match the Chevrolet pickup truck driven by Nash at the time of the murder; there was no evidence that Nash and Spencer were involved in a violent struggle the night she was killed, including no evidence of blood or skin tissue under Spencer's fingernails or evidence of scratches, scrapes, marks or bruises on Nash that would have indicated his involvement in a physical altercation; and physical evidence on the window of Spencer's abandoned car included fingerprints belonging to a known violent sex offender who witnesses stated had been seen with Spencer days before the crime. Plaintiffs further note the fact that Nash was not charged over the course of twenty-six years speaks to the weakness of the case, and Folsom himself testified that "quite frankly, we struggled, and we had some things, and we put some things in the affidavit, and it just wasn't the greatest case, and I wanted it to be better." (Plaintiffs' Exh. J, P. 133).[19]

Upon consideration of the foregoing, the Court finds the reconstructed probable cause statement is insufficient to support probable cause. *Faria*, 2019 WL 4695993, at *8. In other words, the Court finds the evidence that Nash and Spencer had two non-violent arguments prior

---

19 Plaintiffs offer a possible explanation for Defendants' haste in submitting the probable cause affidavit. They note the investigators were under intense pressure from the victim's family, who were calling repeatedly and according to Folsom "becoming a hindrance."

to her disappearance, and that DNA belonging to Nash was found under Spencer's fingernails (with whom he lived at the time) is largely cancelled by evidence of his innocence, including that Nash neither owned a shotgun nor fired one on the date of the incident, that his pickup truck did not leave the tire tracks found at the scene, that there was no evidence Nash and Spencer were involved in a violent struggle the night she was killed, and that physical evidence on the window of Spencer's abandoned car actually pointed to two other suspects who were never investigated. Under these circumstances, the Court is unable to say as a matter of law that probable cause existed such that Defendants Folsom, Mertens and Taylor did not violate Nash's Fourth Amendment rights. *Id.*

In their motions, Defendants argue they nevertheless are entitled to qualified immunity. Qualified immunity protects a government official from liability "unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." *Henderson v. Munn*, 439 F.3d 497, 501 (8th Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In order to determine whether an official is entitled to qualified immunity, the Court asks the following two questions: first, whether the facts alleged, viewed in the light most favorable to the party alleging an injury, show a violation of a constitutional or statutory right, and second, whether the right at issue was clearly established at the time of the offending conduct. *Brown v City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court may decide which determination to make first, *Pearson v. Callahan*, 555 U.S. 223, 235-36 (2009), and "the defendants are entitled to qualified immunity unless the answer to both of these questions is yes." *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012) (citation omitted).

Defendants maintain they are entitled to qualified immunity because they are not DNA

experts, and merely relied on information they allegedly received from the crime lab. They further submit there is no dispute that the effect of hair washing on DNA was not clearly established, and would not have been apparent to non-experts such as Defendants.

Plaintiffs counter that Defendants' assertions only prove their point, that Defendants recklessly included what turned out to be false statements in the probable cause affidavit. They reiterate that Montgomery, who turned out not to be an expert either, denied making the statement that all DNA would have been removed from under the victim's fingernails as a result of the hair washing. Plaintiffs maintain the dispute regarding the statements' origin alone presents a genuine issue of fact that must be presented to a jury.

Upon consideration of the foregoing the Court finds that, viewed in the light most favorable to Plaintiffs, the facts show a violation of a constitutional or statutory right, *i.e.*, the right to have probable cause determined on the basis of the totality of facts and reasonably trustworthy information. *See Williams v. City of Alexander, Ark.*, 772 F.3d 1307, 1310 (8th Cir. 2014). The Court further finds said right was clearly established at the time of the offending conduct, and so Defendants' Motions for Summary Judgment on Count I of Plaintiffs' Amended Complaint must be denied.[20]

## II. State Law Claims (Counts VIII-XIV)

Defendants next assert they are entitled to official immunity from Plaintiffs' state law claims. "Under Missouri law, the official immunity doctrine protects public officials from liability for injuries arising out of their discretionary acts or omissions, but not from liability in

---

[20] The Court agrees with Plaintiffs that in their opening memoranda in support of summary judgment Defendants fail to address, much less establish, their entitlement to judgment as a matter of law or qualified immunity on Counts II-VII of Plaintiffs' Amended Complaint. Defendants' limited discussion of these claims in their reply briefs fails to overcome this deficiency, and so their Motions for Summary Judgment on Counts II-VII will be denied.

claims arising from their performance of ministerial acts." *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 585 (8th Cir. 2006) (citation omitted). "[O]fficial immunity does not apply to discretionary acts done in bad faith or with malice", however. *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015) (internal quotation marks and citations omitted). "A finding of malice requires 'conduct which is so reckless or wantonly and willfully in disregard of one's rights that a trier of fact could infer from such conduct bad faith or any improper or wrongful motive.'" *Wealot v. Brooks*, 865 F.3d 1119, 1129 (8th Cir. 2017) (quoting *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 447 (Mo. 1986) (citation omitted)). "A finding of bad faith embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id.* (internal quotation marks and citations omitted).

In their Motions for Summary Judgment, Defendants assert only that their decisions on whether probable cause existed to make an arrest and what to include in the probable cause affidavit were discretionary. They do not address the well-established principle that official immunity does not apply to discretionary acts done in bad faith or with malice. Upon review of the record, the Court finds that Plaintiffs state facts from which it could be found that Defendants acted in bad faith or with malice. The Court therefore will deny Defendants' Motions for Summary Judgment based on official immunity.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Folsom's Motion for Summary Judgment (ECF No. 49) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants Mertens, Montgomery, and Taylor's Motion for Summary Judgment (ECF No. 52) is **DENIED**.

Dated this 22nd Day of August, 2022.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE